# Hoeh v. Hoeh.

*Deed—Fraud—Setting aside conveyance.*

Where a weak-minded man, ignorant of his legal rights, and without any one to advise him, is falsely told that another person owns his real estate, and is induced and persuaded by such imposition and fraud to convey real estate worth several thousand dollars without receiving one dollar of consideration for the same, such conveyance will be set aside by a court of equity.

Argued Oct. 10, 1900. Appeal, No. 83, Oct. T., 1900, by defendant, from decree of C. P. Jefferson Co., Sept. T., 1890, No. 2, on bill in equity, in case of Michael J. Hoeh v. Margaret Hoeh. Before McCollum, C. J., Mitchell, Dean, Fell, Brown, Mestrezat and Potter, JJ. Affirmed.

Bill in equity for a reconveyance of real estate.

The master, George W. Means, Esq., reported the facts to be as follows:

1. That John Adam Hoeh, the father of Michael J. Hoeh and Adam Hoeh, the husband of Margaret Hoeh, was, in his lifetime, seized in his demesne as of fee of a certain tract of land in Bell township, containing about 111 acres, as described in the first paragraph of plaintiff's bill.

2. That Catherine Hoeh, widow of John Adam Hoeh and mother of Michael J. Hoeh and Adam Hoeh, was in her lifetime seized in her demesne as of fee in a certain other tract of land in Bell township, containing about seventy acres, as described in the second paragraph of plaintiff's bill.

3. That Margaret Hoeh, the defendant, was the wife of Adam Hoeh.

4. That John Adam Hoeh died October, 1870, testate, and by his last will and testament, duly probated and recorded in the register's office of Jefferson county in will book, vol. 1, page 210, devised the 111-acre farm above mentioned to Adam Hoeh, upon condition that he farm the same in good manner and deliver annually one third of the products thereof to his widow, Catherine, and upon the further condition that he pay to his other son, Michael Hoeh, the sum of $800 in manner following: "One-third in one year after my decease to my wife, Catherine, as trustee of my son, Michael Hoeh; one-third in two years to my wife, Catherine, and the remaining one-third in three years after my decease to my wife, Catherine, trustee of Michael Hoeh aforesaid."

5. Adam Hoeh, the brother of plaintiff and husband of defendant, died on February 13, 1889, intestate and without issue, leaving to survive him his widow, Margaret Hoeh, the defendant, his mother, Catherine Hoeh, and an only brother Michael J. Hoeh, the plaintiff; and thereby the said 111-acre farm descended to and became vested in Michael J. Hoeh under the intestate laws, subject to the life interest of Catherine Hoeh, under the will of John Adam Hoeh, and subject to the life estate of Margaret Hoeh, as widow of Adam.

6. On September 4, 1889, Catherine Hoeh died intestate, leaving to survive her Michael J. Hoeh, her son, as her only heir at law, whereupon the seventy-acre farm, above mentioned, descended to, and became vested in, said Michael J. Hoeh in fee simple.

7. That at the time of the transaction complained of in the bill, viz: in the month of December, 1889, and for some time prior thereto, Michael J. Hoeh, the plaintiff, was the owner in fee of the said seventy-acre farm, and was also the owner in fee of the said 111-acre farm, subject to the life estate or statutory dower of Margaret Hoeh, as the widow of Adam Hoeh under the intestate laws.

8. That at the time of the transactions complained of in the bill, to wit: in the month of December, 1889, and for some time prior thereto, the plaintiff, Michael J. Hoeh, was totally blind, was sick with the grip, was a cripple in his legs, was unable to lift so much as five pounds with his hands, was an invalid, and in short was a physical wreck. Mentally he was weak, child-

ish, and vacillating, alternately trustful and suspicious, excitable, confused in conversation, unfamiliar with business affairs and ignorant of his rights. And the master has no hesitancy in finding from the evidence that he was of unsound mind, and to such an extent as to be legally incapacitated from making a contract.

9. He had a large family, consisting of a wife and six children, and was very poor, having little except his interest in the estate of his mother and brother. He never was capable of making a living, and for many years had been watched over and cared for by his mother and his uncle, Jacob Hoeh.

10. After the death of Adam Hoeh, his widow, Margaret, the defendant, and Adam Snyder, her brother-in-law, separately requested Dr. Wm. F. Beyer to make writings that would give her the farm, or write a will, Mrs. Hoeh saying that Adam Hoeh had desired it; which request the doctor refused to comply with.

11. In October, 1889, Margaret Hoeh, accompanied by Adam Snyder, her brother-in-law, came to Brookville and consulted Hon. George A. Jenks as to her right, share and interest in the estate of her late husband, and we have a right to assume that she received proper counsel and was fully informed in the premises.

12. On or about November 22, 1889, George Veit, who had been raised in the family of Adam Hoeh, served a written notice upon Michael J. Hoeh, the plaintiff, and one also upon his uncle, Jacob Hoeh, to the effect that he, Veit, was the adopted son and the legal heir of Adam Hoeh, and as such claimed all his estate, real and personal, subject to the rights of his widow and his creditors. The notices were in the handwriting of C. M. Brewer, Esq., who was the attorney of Margaret Hoeh.

13. The allegations in said notices were false and untrue, and tended to deceive and mislead said Michael J. Hoeh. Veit was not the adopted son of Adam Hoeh, and had no interest in his estate, except, possibly, that of a creditor.

14. Several weeks later, on December 15, 1889, Philip Harrold called on Michael J. Hoeh and represented that Margaret Hoeh had sent him to ascertain if he would take his "mother's things" and sign the deed. He spent the afternoon and evening there, and persuaded him to· propose to Margaret Hoeh to

deed her his interest in the 111-acre farm if she would give him "his mother's things that were yet in the house," and the timber on the north side of the farm, worth $2,000, and would deed him her interest in the seventy-acre farm, which Harrold said was a one-third interest.

15. As a fact, the seventy-acre farm was his own, and Margaret Hoeh had no manner of estate in it; his " mother's things," meaning the personal property left by his mother, were also his own; and the timber spoken of was not worth $2,000, but was only worth about $210, and it was also his property, as it was standing and growing upon the 111-acre farm, the title to which at that time vested in him in fee, subject only to life estate or statutory dower of the widow, Margaret, in the moiety thereof.

16. On the next day Michael J. Hoeh, plaintiff, started to go to his uncle Jacob Hoeh's to consult him, as he says, about this matter, and in passing the house of Philip Harrold he was called in. A few minutes later George Veit was called in, and after talking over the matter for some time, they all three, Harrold, Veit and Michael, went across the fields to Margaret's house.

17. The subject was again talked over, when it was agreed that they would go to Mr. Brewer's office, in Punxsutawney, and Michael would make a deed to Margaret for the 111-acre farm, and Margaret would convey to him his mother's things and the pine timber alluded to.

18. Accordingly, after eating their dinners, Margaret and Harrold walked the near way to Punxsutawney and George Veit borrowed William Hoeh's horse and buggy and conveyed Michael to Punxsutawney by a much longer roundabout road. The more direct road and the one usually traveled led past the house of Jacob Hoeh, but the way taken by Veit did not; in fact, it started out in nearly an opposite direction.

19. On arriving at Punxsutawney it was found that Mr. Brewer was absent at Brookville, attending court. After going to Dr. Walter's office Michael was taken to Spangler's store, where there soon gathered all of the persons named above, to wit: Margaret Hoeh, Philip Harrold, Adam Snyder, George Veit and Michael J. Hoeh. After relating the occurrences to Adam Snyder he " still advised Mike to settle," and proposed that they should go to Brookville next day and close the matter

up. This was agreed to, and arrangements were accordingly made. They then started for home. Harrold gave Michael a bottle of beer, which he carried home, and drank the most of it. Veit took Michael home in the buggy by the same roundabout road, which did not go past Jacob Hoeh's house. On his arrival home Michael found Harrold already there, he having walked by the shorter road, or across the fields, and stopped at his own house on the way and eaten his supper. Mike's wife, Lucy, was absent, but was sent for, and told that she must go along to Brookville next day to sign the deed. She at first refused, saying that she had nothing fit to wear, no shoes and stockings. When she was told that these things would be supplied, she consented.

20. On the next morning, December 17, Philip Harrold arrived at Michael's house before daylight, and escorted Mike's wife, Lucy, to Punxsutawney, by the near way. He then bought her a pair of shoes and stockings at Spangler's store, and had them charged to Adam Snyder by the express orders of Snyder. Later in the morning George Veit came with a horse and buggy and took Michael to Punxsutawney by the same roundabout road he had traveled the day before, and which lead away from Jacob Hoeh's house. The distance by this road was about four and a half miles, almost twice as far as by the shorter and direct road. They arrived in time to eat dinner at a hotel and take the afternoon train to Brookville. The distance from Punxsutawney to Brookville is twenty miles by the road across the country, and the distance by railroad is about fifty miles, but the route by rail is the one usually traveled in going from the one town to the other. All of said parties, Margaret Hoeh, Adam Snyder, Philip Harrold, George Veit and Michael J. Hoeh and his wife, Lucy, embarked upon the train.

21. They arrived at Brookville the same afternoon about three o'clock, and stopped at the Central Hotel. Some time during the evening, after supper, the same parties, Margaret Hoeh, Adam Snyder, Philip Harrold, George Veit, Michael and Lucy Hoeh, gathered together in the room of C. M. Brewer, Esq., in the Commercial Hotel, for the purpose of making the deed in suit. Before the deed was acknowledged a pitcher of beer was brought at Mike's request into the room and was drunk,

Mike drinking one glass and a half. Mr. Snyder rather protested against permitting Mike to have any of it, but Mike said he was not a minor, and Mr. Brewer said, "Oh, let Mike have a glass." Whether the beer had been brought or not, Mike would doubtless have signed the deed. The bringing of the beer only showed how the company looked upon Mike and their disposition to indulge his every whim, and was prompted by the same motive which had kept him constantly supplied with cigars from the time he left home. He had no money and all the expenses of himself and wife were paid from the time he left home until his return, Margaret Hoeh paying at least the railroad fare and the hotel bills. He himself paid nothing.

22. Then, among them explanation was made to Mr. Brewer as to the object of their coming. The bargain previously made at Margaret Hoeh's house was repeated to Mr. Brewer. When the old deed of the seventy-acre farm was produced, Mr. Brewer said, "Why, Mike, this is your mother's old farm," and followed this, according to the testimony of Margaret, with the remarkable statement that if Adam Hoeh had survived his mother he would have inherited the one half of it, but as he was dead, his widow, Margaret, was entitled to the one fourth of it. This statement was not true in fact. This was said in the presence and hearing of all of the party and none of them raised a voice in opposition to it, though at least two of them, Margaret Hoeh and Adam Snyder, must have known that it was not and could not be true. Margaret did not disclaim or deny it, although she had taken counsel on the subject from Hon. George A. Jenks but a few weeks before, and must have known that she had no interest in the seventy-acre farm. Indeed, she expressly testified on the stand that she had never at any time made claim to any interest in or title to any part of that farm.

23. During the evening it was agreed that Mike should convey to Margaret the 111-acre farm and receive in consideration thereof "his mother's things," and the timber from the north side of the farm next to Clawson's and a quitclaim deed from Margaret for her interest in the seventy-acre farm. Margaret Hoeh produced the old deed of the 111-acre farm and Mr. Brewer proceeded to prepare the new deed. Some controversy having arisen as to the boundaries, Mike gave his opinion, and Mr. Brewer said to the rest that Mike knew more about it than

any of them, which was very soothing to Mike's vanity and flattering to his intelligence. As Margaret testifies, Mike had everything just the way he wanted it. Then Mr. Brewer asked the value of the timber in order that he might write the amount of it in the deed for the 111-acre farm as the consideration going to Mike. No one responding to his inquiry, he suggested $1,500, when several said, "Oh, no, that is too much." Mike said, "That is a little high," evidently feeling that he was driving a bargain. But Margaret said it made no difference what it was worth, as Mike was getting all of it. Mr. Brewer said that some valuable consideration must be stated in the deed, and then by a sort of mutual consent $700 was written in. When the writing was completed, Mike and his wife Lucy both signed the deed by mark, Mike at this time being blind and Lucy being unable to write her name, and they duly acknowledged the deed before J. W. Walker, Esq., a justice of the peace called in for that purpose. They then separated for the night, Mr. Brewer saying that it was late and that he would write the quitclaim deed from Margaret for the seventy-acre farm the next morning.

24. Next day Mr. Brewer prepared a deed from Margaret Hoeh to Michael J. Hoeh, releasing and quitclaiming to him and his heirs all her interest in the seventy-acre farm. This deed Margaret duly executed and acknowledged. Then, having eaten their dinners at the hotel, the whole party, Adam Snyder, Margaret Hoeh, George Veit, Philip Harrold, Michael J. Hoeh and Lucy Hoeh, started on the train for Punxsutawney, where they arrived in the evening. There Michael remained at a hotel over night. Harrold took Lucy to his house for the night, and the others went to their several homes. Next morning George Veit came to the hotel with a horse and buggy and took Michael to his house over the same roundabout road they had pursued before.

25. The said 111-acre farm was worth in December, 1889, from $8,000 to $10,000.

26. No money or other valuable consideration passed from Margaret Hoeh to Michael J. Hoeh for the land conveyed by his deed to her for the 111-acre farm, either at the time of making said deed in Mr. Brewer's room in Brookville, or before or since. He never received "his mother's things," or the pine timber mentioned. If he had received them it would not have

been a valuable consideration, for they were already his own property. The quitclaim deed for the seventy-acre farm conveyed him nothing, for Margaret Hoeh had no manner of interest in it to convey.

27. At the time of making the bargain in Margaret Hoeh's house, at the time of the meeting at Spangler's store in Punxsutawney, and at the time of making the deed for the 111-acre farm in Mr. Brewer's room at Brookville, Michael J. Hoeh, the plaintiff, was blind, physically infirm and of unsound mind, and was incapable of making a valid contract.

The master reported in favor of the plaintiff.

Exceptions to the master's report were dismissed by the court, REED, P. J., filing the following opinion:

The master has given this case a very full and intelligent consideration, and from a careful perusal of the testimony we are satisfied that his conclusion of the whole matter is indisputably correct. Whether all his rulings and findings are beyond criticism is not material when the conclusion reached, in any aspect of the case, is fully warranted by the law and the evidence.

There is virtually no dispute regarding the material facts in the case. From the conceded and admitted facts there is no escaping the conviction that the plaintiff, a helpless, weak-minded man, ignorant of his legal rights and without any one to advise him, was induced and persuaded, by imposition and fraud, to convey to the defendant real estate worth several thousand dollars, without receiving one dollar of consideration for the same. One must be credulous, indeed, to believe that Veit, Harrold and Snyder were mere accidents in this transaction, and that there was no purpose or design in the part taken by them, or that the part so taken was independent of the defendant and without her knowledge or connivance. But it is not material whether they were acting in concert and by design or not. It was their conduct that manifestly prepared and induced the plaintiff to do what he subsequently did do, and the defendant became the beneficiary of all the fraud and imposition which had been practiced upon him. In these circumstances the testimony disclosing this conduct of Veit, Harrold and Snyder was clearly competent and admissible for the pur-

pose offered.  If it were necessary, however, to show that the defendant was a party to all that was said and done, the link to connect her with the chain of fraud and deceit is not missing.  Aside from the surrounding facts and circumstances connecting her with it, the substantially undisputed testimony of the plaintiff is: "Harrold told Veit what Harrold and me had been talking over the day before (Sunday afternoon and night), and then Veit said let us go over and see Margaret Hoeh, and then we all three went over.  Then, after we got over, Philip Harrold related the story about the timber, loose property and real estate, what we had talked about the day before, to Margaret Hoeh, and then Margaret Hoeh asked George Veit whether they should give the timber, and George Veit said to her he guessed they would give the timber.  She said George Veit was, she pronounced him, boss."  The promulgation of Veit as boss was evidently based on the knowledge that he had so declared himself to the plaintiff by claiming to be the adopted son of Adam Hoeh.  Veit and Harrold testify that when the proposition to convey the 111-acre tract was made by the plaintiff to the defendant, the latter took it under advisement, and, "after studying over it a little," she graciously consented to accept something for nothing.  This piece of acting was the appropriate culmination of the farce being enacted.  The plaintiff was not so circumstanced financially as to make any gratuitous bestowal of his property upon the defendant, and it is not alleged nor even remotely intimated that he intended or supposed he was doing so.  It was the perpetration of a gross and palpable fraud, and to allow the defendant to profit by it would be an outrage on justice.

The complaint that the testimony does not warrant the finding that the plaintiff was of unsound mind at the time he executed and delivered the deed sought to be canceled, is without force in the face of the proof that he was incapable, by reason of his mental and physical condition, of protecting and defending himself against the methods adopted and resorted to for stripping him of his property.

If it be conceded that the defendant had a valid claim against the estate of her deceased husband, when she abandoned it in an effort to extinguish, by trick and artifice, the rights of the plaintiff in said estate, she placed herself beyond the pale

of equitable relief. If the debt is now barred by the statute of limitations she has no one but herself to blame. A court of equity will not concern itself about a claim that has been lost in an attempt to perpetrate a fraud.

It was suggested on the argument that this was an ejectment bill, and that a court of equity had no jurisdiction. If the question of jurisdiction were a doubtful one it would be too late to raise it for the first time on the argument of exceptions to the master's report. But we do not think the question is a doubtful one in the circumstances of this case.

The full and careful consideration given the case by the master renders its further consideration by us unnecessary. The exceptions to his report are all overruled and the report confirmed.

This cause came on to be heard at this term, and was argued by counsel, and, thereupon, upon consideration thereof, it is ordered, adjudged and decreed as follows, viz: That the defendant, Margaret Hoeh, deliver up the paperwriting purporting to be a deed from Michael J. Hoeh and Lucy Hoeh, his wife, bearing date December 17, 1889, described in plaintiff's bill to be canceled, and that the same be canceled, annulled and taken for naught, and that the said defendant, Margaret Hoeh, pay the costs of this suit, including the master and examiner's fees, as taxed by the court, $300, and that in default of payment of the master and examiner's fees by the defendant upon demand, the plaintiff, or his administrator, pay the same, with right thereafter to recover the same from the said defendant.

*Error assigned* amongst others was the decree of the court.

*H. Clay Campbell*, for appellant.—To set aside a written instrument on the ground of fraud, the evidence thereof must be clear, precise and indisputable, and of that which occurred at the execution of the instrument: Cummins v. Hurlbutt, 92 Pa. 165; Bierer's App., 92 Pa. 265; Du Bois Borough v. Du Bois City Water Works Co., 176 Pa. 430; Davidson v. Little, 22 Pa. 245.

A bill in equity which prays for the cancelation of a deed alleged to have been procured by fraud, and for a decree re-

storing to the complainant the possession of the land, will be dismissed as an ejectment bill: Miller v. Miller, 68 Pa. 486; Long's App., 92 Pa. 171; Meck's App., 97 Pa. 313; Richard's App., 100 Pa. 51.

The compromise of a suit or controversy in law is a good consideration to support an agreement based thereon: Hagey v. Detweiler, 35 Pa. 409; Brockley v. Brockley, 122 Pa. 6; 1 Wharton on Contracts, sec. 533; 1 Parsons on Contracts, sec. 438.

Family arrangements are favorites of the law, and if fairly made are not to be disturbed by the parties: Walworth v. Abel, 52 Pa. 370; Bierer's App., 92 Pa. 265.

*Cadmus Z. Gordon,* with him *W. W. Winslow* and *Jo..n E. Calderwood.*—The jurisdiction of equity over such a case as this cannot be doubted. Here we have actual misrepresentation of material facts, suppression of other equally material facts, absolute lack of consideration, sickness, blindness, crippled condition of both arms and legs, intoxication and mental weakness: Brightly's Equity, sec. 69; Bispham's Equity (4th ed.), 252.

PER CURIAM, October 22, 1900:

The master's findings of fact and conclusions of law approved by the learned judge of the court below in a clear and concise opinion render it unnecessary to discuss the evidence on which the findings are based, or to cite the cases referred to in the master's report as sustaining his conclusions of law. It is sufficient to say of the findings of fact that they have adequate support in the testimony, and of the conclusions of law that they are fully sustained by the decisions of this court. We therefore affirm the decree on the concise and clear opinion of the learned court below, and dismiss the appeal at the cost of the appellant.